Our fifth case for this morning is United States v. Samantha Sykes. When you're ready, Mr. Shaver, we'll hear from you. Bill Shaver Good morning. I'm Bill Shaver and I'm Samantha Sykes' appointed counsel. I was the counsel at the trial level and I'm the counsel here today on the appeal. We've raised three sentencing issues that we think demonstrate that the court erred in sentencing Samantha, and I'd like to take those in the order that they are addressed in the brief. The first is what amount of money should be used to assess or to determine Samantha Sykes' offense level? So basically, what's the full extent of the scheme and did she know about or could she reasonably foresee the full extent of the scheme? Let me describe the crime a little bit for you before I talk about her involvement. This is a bank fraud case where the head was a guy named Melvin Sykes, and he got nominees to go into banks with false information and open up bogus bank accounts. But she's aware that this is a broader deal than just the cousin and herself in a couple of ways, and where I get stuck on your first argument, your amount of loss argument, is that the guidelines say that for this offense the loss is the greater of actual or intended loss. So once you connect her to the scheme, it seems to me hard to say that the intended loss isn't the full $653,000 in sum. Maybe the actual loss is a little smaller, $506,000, but that doesn't matter because it's the same consequence under the guidelines. So once she's part of the scheme, why isn't this reasonably foreseeable to her? Every defendant that's part of a scheme isn't liable for all of the scheme if they don't reasonably- Not necessarily, but the district court finds. These are facts, right, that the district court finds. I don't believe, and we don't believe, and we stated in our brief that the full extent of this fraud was not reasonably foreseeable, Samantha. But you would agree with me that's a fact-finding, whether it's reasonably foreseeable to her. Yes, it is. It's a finding of fact. You have to have a firm and definite conviction that a mistake has been made. But the fraud involved 32 nominees, full fraud. You mentioned a Melvin Hicks. Melvin Hicks. What relation is Melvin to Terry Hicks, Terrence Hicks? Melvin was just an acquaintance of all of the people involved in the scheme. He concocted the scheme and then had other people working for him. Including a Terry Hicks? Terry Hicks was Samantha's cousin who got Samantha involved in the scheme because she needed some money. And she was living with Terrence Hicks? For a while, yes. During the scheme? Yes. And, you know, Terry was more involved than Samantha. Terry, of those 250 bogus accounts, probably assisted in opening 125. He nominees probably 21 of the total 32. But Samantha was only involved with three nominees. She only assisted six of the nominees. I think the government says six. Well, no. She found three nominees for the scheme, but she assisted six of the nominees in going into the bank and presenting the false information and getting the accounts opened. Which does suggest a deeper level of involvement on her part than with, say, Morris and Pittman, who you look at. They weren't going to the banks and coaching somebody through the whole fraudulent process. No, yeah. No doubt there was a difference in actions. And thus, why not a difference in sentence? Based on the actions. Well, on this issue, where we're determining what the sum should be in determining the sentence, there can be a difference in the way that they act and different actors act, but is the full scheme reasonably foreseeable to them, one or the other? I say the scheme is reasonably foreseeable in the same way for Hicks or for Pittman and Morris as it was for Samantha. The individuals she coached at the bank, how many of those had she recruited and how many had others recruited? She went in with the three individuals that she recruited, and she also went in with three other individuals that were recruited by somebody else. Do we know who, though, had recruited those individuals? No, I don't. The record doesn't reflect that? No, no. There's nothing in the record to reveal who those three additional were that were recruited, although I'd note that Pittman and Morris recruited people as well. So they would have known about that part of the scheme, about the false information and about going into the banks to get bogus accounts. They'd know about the deposit of funds into the accounts, and interestingly they went out to the casinos with Hicks and with Terry Sykes to withdraw money, which Samantha never did. This is an interesting part of the scheme to me. I didn't know that you go to casinos in order to sort of finish up a check-hiding operation. Well, they issued cards, account cards, and then they used the account cards out at the- To pull the money out of the accounts before the banks noticed. The second issue I raised is, were sophisticated means used in this case? Was there a greater level of planning or concealment than a typical fraud of its kind? So why isn't the fact that they essentially create a bunch of fake corporations, which you could call fictitious entities, and they come up with phony documents for all these corporations, something that does kick it up into a more sophisticated level? You could have just had individuals opening bank accounts and moving checks all over the place, but they create this whole fantasy world of corporations. I don't know if you could have done it in a simpler fashion. I think given the bank fraud in this case, I don't think it could have been done any simpler than it was. Why couldn't you? Well, I mean, but I'm asking you, they used fake corporations. What is it about fake corporations that were necessary to hoodwink the banks into going along with this? Well, you'd still need the accounts opened in order to- Right, but an individual can open an account. You could open an account. Yes. I could open an account without a big saying that I'm the XYZ company. I could just open an account. So why is this not, in fact, somewhat more complex? Well, on paper, it was a false individual who's going in and claiming that they want to open a business. They didn't take any steps to actually have a business, have some type of storefront, have some type of relation to a phone number. It was just on paper. But wasn't the paper designed to impress the bank officials? It was, Judge. So- It was, Judge. I just think that in the grand scheme of things, there was not especially complex actions taken in this case to allow for a finding of sophisticated means. The last argument, and probably the one that troubles me the most, is the district court's failure to give detailed and meaningful consideration to Samantha Sykes' dire family conditions. But what else could the judge have said? I mean, of course you don't agree with the way the judge came out of it. Of course. And it's a sad situation, certainly for the children. But the judge says, I've considered that she's a sole caregiver for her children. There may not be another caregiver readily available. These are mitigating. But he says he just doesn't see that it outweighs. And so I don't know why this is a problem with what he said as opposed to what he did. I think it's the summary fashion that he dismissed Samantha's arguments. The arguments were detailed. They set forth a heartbreaking situation. Two kids lived alone, the only mother they'd ever known. And there's no family members to take care of them if she's incarcerated. I took from one of his comments that he thought it was kind of a negative thing that she was pregnant with her first child while she was participating in the scheme, knowing that she was going to have a child. Yeah. The judge noted that. He said that you were having a baby at the time the scheme was involved and you never should have gotten involved in it. But it was the summary fashion where he claimed, after all this extensive and detailed information was presented to the court, he stated those that commit crimes are not excused simply because they have children. We weren't arguing that she simply had children. We were arguing that she had children. She was the only parent those children had. If she was incarcerated, there were no one to live with or for those kids to live if she was incarcerated. He never addressed the seminal issue as this court requires. What's going to happen to the kids? What's going to impact the kids? And I think it could have fashioned a sentence that met justice but addressed the issue of what's going to happen to these innocent people if she's sent to jail. Okay. Your time has expired. I'll give you a minute when Mr. Dale is finished. Good morning, Mr. Dale. Good morning. May it please the court. My name is Yusef Dale, and I represent the government aptly in this case. This court should affirm the district court's sentence of 57 months, which was at the bottom of its applicable guidelines range. Taking the issues in order, the district court reasonably determined that defendant was responsible for her co-defendant's conduct that led to the entire loss amount of the scheme of over $600,000. So could I ask you a question about that, though, Mr. Dale? I mean, it seems that the district court says you must have known that at least more than one other person was involved, but does that go out to infinity? I mean, if the scheme had involved 100 people, would she have been held, you know, that that was reasonably foreseeable to her? I mean, I just couldn't see how this finally got tied off with the outer limits of the scheme. Your Honor, once you understand this defendant's position within the scheme and the defendant understood that the profit mechanism of the scheme was to recruit as many people as possible and to therefore increase the profits of the scheme, then, yes, all of the people who would have ever been recruited would have been reasonably foreseeable to her, only because that's the profit mechanism of the scheme. And it makes, once you understand that that's how the scheme's profits are generated, then you understand that people are continuing to be recruited and that those individuals will continue to open accounts. So I'm a little troubled by that because it strikes me that there's no indication of what the scope of the operation is and, you know, 1,000 people. I mean, it seems like I would want to see some evidence that she has some idea of what the broader outlines are. Now, maybe this is small enough that by the time she's got Terry or Terrence and she's helping a few people at the bank, maybe this is all fine, but I really don't see where the district court says, you know, she would have had some reason to believe that this is, you know, in the half-million-dollar range or something. The district court's, as I understand the district court's position, is that once the defendant understands that she's not the only one recruiting people, that other people are recruiting people, then whatever loss comes from that is reasonably foreseeable to her. Not that she may not have known every single person. She may not have known every single dollar, but it's reasonably foreseeable to her because she knows, number one, that her cousin is recruiting. She lives with him. She's recruiting people that they're – she's actually recruiting herself, Morris, who's recruiting other people. He recruited two other people. She's dealing with Hicks on a regular and continuing basis on the people that she has brought to the bank. And so once you're that involved with the scheme, once you are talking – by inference, we know she's talking with Terrence, her cousin. They live together about the scheme. And once you are that involved with the scheme and that involved with the scheme's leadership, then the reasonable foreseeability prong is most definitely satisfied because you understand what the scheme is all about. And so I think the district court did not clearly err when he determined that that was reasonably foreseeable to her, the conduct that led to that loss amount. I'm troubled with the sophistication enhancement here. It seems like if it's sophisticated – it's certainly on the low end of sophisticated. There are really just a couple of different things that had to be done for this to work. Did you want to say you think it was on the low end of the sophisticated scheme? Yeah, yeah, at best. It would be on the low end. Here's – because of the complexity, Your Honor, involved – it involved a lot of different intricate moving parts. In other words, first the nominees had to be recruited. Then they had to drive to the bank and the documents had to be created. And the documents had to be sufficiently – they had to be sufficiently authentic looking to pass the test of bankers who presumably have seen business documents. They know what they look like. You had to have IRS documents. Then people had to coordinate the timing. The timing was really key because none of the accounts had money in them to cover the checks. So the timing had to be just so that once the checks were written, the deposits appeared to have money in them. And right at that moment, before the banks figured out, well, there's really no money in here, people had to go to casinos with bank cards. There had to be communication between the mid-level managers, which would be Terrence and the defendant, the top level, who was Hicks, who was the one actually inflating the accounts, and then the bottom level people who had to come to the casinos, get the cards, go to the cashiers, get the money. There's a lot of moving parts and a lot of intricacies in that. Would that be true in every check-kiting scheme, though? I mean, do you just get sophisticated means any time somebody defrauds a bank? No. No, not every time somebody defrauds a bank, but whenever there's multiple and multiple accounts, multiple fraudulent documents, multiple moving parts, multiple people involved in the scheme, we think that certainly the district court did not clearly err in finding that that was sophisticated beyond the normal scope. And as Your Honor pointed out on the questioning of counsel, and in fact we think it's interesting that in this very indictment, earlier on in count one, before this sophistication started, actually, that the Hicks was involved with just defendant Terrence in a more simple scheme where they were just doing regular people and not doing corporations and multiple corporate documents. And just to clear up a little bit of, I think, confusion that happened on the questioning, Hicks is the leader. I think a couple of times the names got confused, but Terrence Sykes is the cousin, and Samantha Sykes is the defendant in this case. There's only one Hicks, and that's the leader Hicks. Finally, Your Honor, with respect to the sentence, as Your Honor's pointed out, the district court just simply could not have done more in this case to satisfy the procedural reasonableness requirements. He recognized the argument. He found it to be mitigating. I'm talking about defendant's primary argument for mitigation, her circumstances. And if the court would let me know if I'm running out of time, I can't see the lights, of course. I'll tell you. Thank you. He reminded, the court took note of that. He found it to be mitigating. Ultimately, he simply decided that that factor was outweighed by the seriousness and the other 3553A factors. I've very rarely seen a more complete procedural decision than this one. For all those reasons, Your Honor, we would ask that this court affirm the 57-month sentence, which was at the bottom of the applicable guidelines range. All right. Thank you very much, Mr. Dan. If this court doesn't have any more questions, I'm sorry. No, I think we're okay. Thank you. And as I told you, Mr. Schaffer, I'll give you one minute to wrap up. Mr. Dale claims that Samantha knew more and was more involved in the scheme than a lesser defendant. She said that, or he says that that's the case because she lived with Terrence. He said that she talked to Hicks. Well, there's no evidence how much she talked to Hicks, any more so than anybody else in this case. Well, there's only evidence of opportunity, I suppose. And, yeah, there's an opportunity to talk to Terrence Sykes, but there's no evidence that any information was extended and traded between those two people. So an inference? Yeah, a presumption may be, but no evidence. Well, the trial judge can draw those inferences, though. Can't the judge do that from the record, from the pre-sentence report? He can draw our inferences, but are they strong enough inferences to give them credence? I mean, the fact that I don't think there's any inference as far as Hicks and saying that her knowledge of him and her knowing him necessarily means she knows more about the crime. Thank you, Judge. All right, thank you very much. And as you said, Mr. Schaffer, you were appointed. The court appreciates very much your assistance to your client and to us. Thank you. And thanks to the government as well. We will take the case under advisement.